1

2

3

4

5                UNITED STATES DISTRICT COURT

6                EASTERN DISTRICT OF WASHINGTON

7    JOE JARVIS and JOHN SMITH,

8                          Plaintiffs,                NO:  11-CV-0321-TOR

9         v.                                          ORDER GRANTING PARTIAL
                                                      SUMMARY JUDGMENT
10   JOHN JANNEY, in his individual
     capacity, and CHELAN COUNTY
11   PUBLIC UTILITY DIST. NO. 1

12                         Defendants.

13        BEFORE THE COURT are Plaintiffs' Motion for Summary Judgment (ECF

14   No. 61), Defendant John Janney's Motion for Summary Judgment (ECF No. 82),

15   and Defendant Chelan County Public Utility Dist. No. 1's Motion for Summary

16   Judgment (ECF No. 91).  These motions were heard with oral argument on June

17   20, 2012.  Steven C. Lacy appeared on behalf of the Plaintiffs.  Portia R. Moore

18   and Jeffrey B. Youmans appeared on behalf of the Defendants.  The Court has

19   reviewed the motions, the responses, the replies, and the record herein and is fully

20   informed.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 1

BACKGROUND

This is a wrongful termination lawsuit filed by two former employees of Chelan County Public Utility District No. 1.  Plaintiffs have sued Defendants for violating their rights to substantive and procedural due process under 42 U.S.C. § 1983, and for the tort of breach of a promise of specific treatment in a specific circumstance under Washington common law.  The parties have filed cross-motions for summary judgment on Plaintiffs' § 1983 claims, and Defendant PUD has moved for summary judgment on Plaintiffs' state law claims.  Plaintiffs concede that their substantive due process claims should be dismissed, but maintain that summary judgment is appropriate as to their procedural due process claims.  Plaintiffs also oppose summary judgment on their state law claims.

FACTS

Chelan County Public Utility District No. 1 ("the PUD") provides utility services to residents of Chelan County, Washington.  Beginning in approximately the year 2000, the PUD began an ambitious campaign to build a county-wide fiber-optic data network for use by its business and residential customers.  From the beginning, the PUD planned to extend this network to as many areas of Chelan County as possible—including its more rural areas.

Recognizing that the project would require an extensive amount of planning, the PUD assigned several of its employees to a so-called "fiber group" tasked with

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 2

1   designing the network and budgeting for its construction.  This group was led by

2   Plaintiffs Joe Jarvis ("Jarvis") and John Smith ("Smith").  In their capacities as

3   Executive Manager of Operations, and Managing Director of Engineering and

4   Technology, respectively, Jarvis and Smith were the two highest-level managers

5   directly assigned to the build-out project.  Jarvis and Smith both reported to

6   Defendant John Janney ("Janney"), the PUD's General Manager and highest

7   appointed official.

8       By 2009, the PUD had invested more than $100 million in the fiber project.

9   Despite this sizeable investment, however, the network had only been extended to

10  about 75% of the private residences in Chelan County.  The PUD estimated that

11  extending the network to the remaining 25% of residences—many of which were

12  located in rural areas—would cost an additional $60 million.  Knowing that it

13  could not afford this additional cost without raising utility rates, the PUD sought

14  input from its customers about whether the network should be extended to the

15  remaining 25% of the county.  Those surveyed overwhelmingly rejected a rate

16  increase to finance the $60 million build-out.  ECF No. 85 at 344.

17      In September of 2009, the PUD learned of a federal grant program created

18  by the American Recovery and Reinvestment Act of 2009 known as the Rural

19  Utilities Service Broadband Initiatives Program ("RUS").  In early 2010, the PUD

20  decided to pursue an RUS grant as an alternative means of financing the build-out

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 3

to the county's more rural areas.  The PUD assigned Jarvis and Smith to oversee the application process.

On March 27, 2010, the PUD submitted a formal application for an RUS grant.  In its application, the PUD explained,

> With access now extended to approximately three-fourths of Chelan County, CCPUD hopes to complete the system to reach at least 98 percent of county residents.

> \*    \*    \*

> With RUS funding, CCPUD would extend its [fiber-optic] infrastructure to serve the remaining 6,811 rural premises that are still without access to broadband.

> \*    \*    \*

> An additional . . . $33 million ($3665) per premises will allow CCPUD to provide high-speed access to remaining rural end-users to cover approximately 98 percent of the county.

ECF No. 85 at 321-23.

On August 4, 2010, the PUD was informed that it would be awarded an RUS grant—provided that it agreed to contribute $8 million of its own funds toward the $33 million overall cost.  Shortly thereafter, the PUD surveyed its customers once again to determine whether they were willing to fund the $8 million contribution through rate increases.  In this survey, the PUD asked,

> The Chelan County PUD has installed broadband fiber optic internet service in approximately 85% of the county, at a cost of about $100 million dollars. That means about 15% of county residents still do not have access to broadband fiber optic internet service.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 4

\*   \*   \*

> The PUD applied for, and has been offered, a $25 million dollar grant from the federal government under the stimulus bill.  If the grant money is accepted, the PUD would need to provide about $8 million of its own money to complete the build-out over the next three years in mostly rural areas of Chelan County.  If the PUD accepts this grant, electric rates may need to increase up to 3% for the average residential customer, in order to complete the broadband system build-out county-wide.  Now, knowing that to cover costs of completing the build-out, residential rates may increase up to 3% -- or about $1.50 extra per-month for the average customer based on current estimates – do you think the remaining 15% should be completed or should not be completed?

ECF No. 85 at 358.  Sixty-one percent of respondents answered that they were in favor of increasing rates to fund the PUD's share of the build-out cost.  ECF No. 85 at 358.

On August 24, 2010, the PUD hosted a public meeting to discuss whether the RUS grant should be accepted.  At this meeting, the PUD gave a presentation outlining the terms of the grant and discussing the advantages and disadvantages to accepting the funding.  This presentation informed the public, *inter alia*, that (1) the "[t]otal amount to complete build-out is $33 [million];" (2) that the PUD would be responsible for contributing $8 million to the project; (3) approximately 6,800 premises would be reached by the build-out; and (3) approximately 64% of customers surveyed were in favor of increasing rates to fund the PUD's $8 million contribution.  ECF No. 85 at 367-68, 375.  At the conclusion of the meeting, the PUD invited members of the public to comment on whether the grant funds should

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 5

be accepted.  The PUD's Board of Commissioners voted to accept the RUS grant

and to increase utility rates 2-3% the following day.

On January 18, 2011, the PUD held a meeting of the "Fiber Strategic

Planning Subcommittee" to discuss the status of the fiber build-out.  At this

meeting, Jarvis and Smith presented the following information concerning the

network-access status of the private residences in Chelan County (in substantially

the following format):

Networks Premises Status as of 1/14/2011

|  | Premises | | Pending Orders | |
|---|---|---|---|---|
| Lit Premises | 31,029 | 69% | 864 | 12% |
| RUS Premises | 7,468 | 17% | 545 | 8% |
| Infill – Not yet lit | 6,523 | 14% | | |
| **Total Premises:** | **45,020** | **100%** | | |

ECF No. 85 at 405.  Those attending the meeting, including two members of the

PUD's Board of Commissioners, were surprised to learn that the fiber group was

distinguishing between "lit" premises (*i.e.*, premises that could be readily

connected to the fiber network) and "infill" premises (*i.e.*, premises that would

require an additional infrastructure build-out) for purposes of tracking the

network's completion.  Many attendees believed, based upon the representations

that had previously been made to the Board of Commissioners and the public, that

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 6

85% of the PUD's customers had "full" connectivity to the network prior to the RUS build-out.  Based upon the information presented at the meeting, however, many came to understand that only 69% of the PUD's customers were "fully" connected to the network, and that an additional investment would be required to connect "infill" customers—none of whom were located in areas covered under the RUS grant. The significance of this realization was that the RUS-funded build-out would not result in 98% of private residences being "connected" to the network as the PUD had informed the public when it proposed the 2-3% rate increase.

On Friday, February 4, 2011, Janney met with Jarvis and Smith individually to discuss the apparent discrepancy between the 98% coverage figure and the numbers presented at the January 18, 2011 subcommittee meeting.  During these meetings, Janney focused on the fact that the PUD's representations to the federal government, its Board of Commissioners, and the general public about the RUS grant extending coverage to 98% of the county could be misleading in light of the additional investment required to provide access to the "infill" premises.  Jarvis and Smith replied that the representations could be construed as misleading when read out of context, but maintained that they were generally accurate based upon the manner in which the fiber group had classified premises throughout the project.

On Monday, February 7, 2011, Janney again met with Jarvis and Smith individually to inform them that their employment was being terminated.  The

1   PUD's General Counsel, Carol Wardell ("Wardell"), and Director of Human

2   Resources, LaDawn Ostmann ("Ostmann"), were also present.  During this

3   meeting, Janney read from a script that had been prepared by Ostmann at Janney's

4   request.  The script read as follows:

> Joe/John, we met Friday to discuss the misinformation relied upon by the
> District and our customers surrounding the decision to accept the RUS
> funds.  You acknowledged knowing that the information in the survey and
> other communications was misleading and that it was your responsibility to
> ensure the information was correct, especially in light of the public scrutiny
> we all knew would surround this decision.
>
> Your carelessness and inattention is not acceptable, particularly for someone
> at your level in the organization.  The resulting damage to the District's
> reputation caused by this oversight will take considerable efforts to
> overcome and jeopardizes our ability to deliver on our strategic plan.
>
> I need people on my team I can rely on and trust.  The bottom line is,
> John/Joe, I no longer have that level of confidence in you or your abilities.
> As a result, you are being terminated effective Wednesday, February 9th.
>
> You have the right to be heard on my reasons.  We discussed the issues and
> impact on the District's reputation on Friday.
>
> You will be paid for the rest of this pay period and will have a couple hours
> to get what you need from your office, although you no longer have access
> to your computer.  You should contact Michael Wilson in security to set up a
> time to retrieve your personal belongings.
>
> Do you have any questions?

ECF No. 85 at 411.

Later that same day, Janney sent an email to all PUD employees to inform

them that Jarvis and Smith had been terminated and to advise them of new

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 8

temporary management assignments.  ECF No. 85 at 418.  This email read, in

pertinent part:

> To restore full confidence in my management team, especially as we make
> critical decisions about the future of our fiber-optic system, I am announcing
> several changes in our management organization, effective today.  These are
> difficult steps, but I believe they are necessary.

> This morning I met with Executive Manager Joe Jarvis and with Managing
> Director John Smith to tell them they will no longer be working at the
> District.

ECF No. 85 at 418.

Also on February 7, 2011, Janney issued a press release announcing Jarvis's

and Smith's firings.  The press release read, in relevant part:

> To restore full confidence in his management team as decisions are made
> about the future of the PUD's fiber-optic system, General Manager John
> Janney announced changes today.

> Janney met with Executive Manager Joe Jarvis and with Managing Director
> John Smith to tell them they will no longer be employed at the District.
> Jarvis has been executive manager of the Operations Group, and John Smith
> has been managing director of Engineering and Technology Division.  Their
> duties have been redistributed to other PUD managers temporarily.  Janney
> said he will be looking at the overall management structure to find the best
> alignment moving forward.

> "It is important for me to be philosophically aligned with my management
> team in order to have full confidence in the information and the approach we
> are developing for a program as extensive as our Networks system," said
> Janney.  "I want to assure our customers that we are taking appropriate steps
> to get the best information possible about coverage and cost estimates and to
> be in a better position to move forward with our fiber program."

> The PUD is about to launch an additional build-out to more rural areas of the
> county with help from a $25 million federal grant.  The PUD will be

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 9

required to match 25 percent of the costs, estimated to be about $8.3 million.
Starting today, the fiber program will be overseen directly by Janney.

ECF No. 85 at 421.

Janney met with Smith once again the following morning at Smith's request.
During this meeting, Smith told Janney that he did not fully understand the reasons
why he had been fired.  Specifically, Smith stated that he did not perceive any
differences in "philosophical alignment" between himself and Janney and that, in
his mind, both had been dutifully carrying out the wishes of the PUD's Board of
Commissioners.  ECF No. 85 at 416.  Smith also lamented that Janney had not
given him any advance warning that his job was in jeopardy and that, had he been
advised of this fact, he would have made efforts to "correct things."  ECF No. 85 at
416.  Finally, Smith advised Janney that he "never felt [that his] job was in
jeopardy[,] so [he] went out and bought a new car."  ECF No. 85 at 416.  Janney
ultimately declined to reconsider his decision to terminate Smith.

Approximately two months after Jarvis and Smith were terminated, the
PUD's Board of Commissioners voted to withdraw from the RUS grant.  This
decision was largely based upon (1) the PUD's revised estimate that it would cost
between $53 million and $67 million to build-out the network to 98% coverage;
and (2) the PUD's knowledge that it could not complete the build-out to 98%
coverage within the three years specified by the terms of the RUS grant.  Shortly

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 10

after withdrawing from the grant, the PUD rescinded the rate increases which were designed to fund its $8 million contribution to the RUS build-out.

Six months after Jarvis and Smith were terminated, the PUD offered each of them a post-termination hearing.  ECF No. 85, Exhibits NN and OO, pages 446-51.  Neither accepted the offer.

DISCUSSION

**A.  Summary Judgment Standard**

Summary judgment is appropriate when a moving party demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the affidavits, pleadings, and discovery that demonstrate an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  For purposes of a summary judgment motion, a fact is "material" if it might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.* at 248.  In determining whether there is a genuine issue of material fact sufficient to preclude summary judgment, a court must construe the facts, as well as all rational

1   inferences therefrom, in the light most favorable to the non-moving party.  *Scott v.*

2   *Harris*, 550 U.S. 327, 378 (2007).

3       **B.  Adequacy of Pre-Termination Procedures**

4           Plaintiffs allege that Janney and the PUD violated their Fourteenth

5   Amendment right to procedural due process by failing to provide them with an

6   adequate pre-termination hearing.  It is well-settled that a public employee with a

7   constitutionally-protected interest in his or her continued employment is entitled to

8   due process prior to being terminated.  *Cleveland Bd. of Educ. v. Loudermill*, 470

9   U.S. 532, 538 (1985).  Generally speaking, due process requires that an employee

10  facing termination receive "oral or written notice of the charges against him, an

11  explanation of the employer's evidence, and an opportunity to present his side of

12  the story."  *Id.* at 546.  Although an employer need not provide a full evidentiary

13  hearing, it must, at a minimum, allow an employee facing termination "to present

14  reasons, either in person or in writing, why [the] proposed action should not be

15  taken."  *Id.* at 545-46.  As the Supreme Court emphasized in *Loudermill*, an

16  employee's opportunity to be heard must occur before the employee is terminated.

17  *Id*. at 546 ("[T]he root requirement of the Due Process Clause [is] that an

18  individual be given an opportunity for a hearing *before* he is deprived of any

19  significant property interest."  *Id.* at 546 (emphasis added) (internal quotations and

20  citations omitted).

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 12

As an initial matter, the court finds that Jarvis and Smith had a protected property interest in their continued employment with the PUD by virtue of Policy # 101 ("Policy 101").  By the express terms of this policy, non-bargaining unit employees like Jarvis and Smith could be terminated "only for cause."  ECF No. 85 at 413.  This provision was added to the policy in 2004 for the express purpose of changing the employment status of non-bargaining unit employees from "at will" to terminable only for cause.  Counsel for the Defendants conceded this point at oral argument.  Accordingly, Jarvis and Smith were entitled to a pre-termination due process hearing.[1]  *Loudermill*, 470 U.S. at 538.

Turning to Jarvis's and Smith's terminations, the court finds that the pre-termination procedures followed by the PUD were deficient for two reasons.  First, Janney did not advise Jarvis and Smith that they were facing potential termination

---

[1]  Policy 101 plays no role in deciding what process was due in this case.  Section 1983 serves "to ensure that an individual [has] a cause of action for violations of the Constitution."  *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617-18 (1979).  Employer policies and procedures do not create Constitutional rights.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 13

before they were formally terminated on February 7, 2011.[2]  In the Ninth Circuit,

notice of an employer's intent to terminate is an essential component of pre-

termination due process.  *Matthews v. Harney Cnty. Sch. Dist. No. 4*, 819 F.2d 889,

892 (9th Cir. 1987).  Contrary to Defendants' assertions, mere notice of the

"charges" against an employee will not suffice:

> On the issue of notice, we read *Loudermill* to require, in advance of any pre-
> termination hearing (1) *notice to the employee as to the pendency or*

---

[2] When asked directly during his deposition whether he informed Jarvis and Smith

that he was considering terminating their employment prior to February 7, 2011,

Janney did not give a direct answer.  Rather, Janney responded that he had

previously pressured Jarvis and Smith to "get to the heart of what the real numbers

were," and that the purpose of the February 4, 2011 meetings was to allow Jarvis

and Smith "to explain to me why the numbers that we presented back in August

[2010] was so materially different [sic] than the numbers we had seen on the 18th

[of January, 2011] and on the 1st [of February, 2011]."  Janney Dep., ECF No. 74,

at 191-92.  Jarvis and Smith, for their part, both testified that they were completely

unaware that Janney was considering terminating their employment until they were

formally terminated on February 7, 2010.  Jarvis Dep., ECF No. 80, at 205-210;

Smith Dep., ECF No. 81, at 227-28.  At oral argument, Defendants' counsel

conceded that termination was not mentioned during the February 4 meetings.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 14

*contemplation of a dismissal action*, and (2) notice as to the charges and evidence which gave rise to that concern.

*Id.* (emphasis added).

Here, Defendants concede that Jarvis and Smith were never advised that the PUD was considering terminating their employment prior to their meetings with Janney on February 7, 2011.  Although Janney expressed his frustrations with Jarvis and Smith on February 4, 2011, he failed to mention that he was considering terminating their employment (or any other form of disciplinary action) on that occasion.  ECF No. 63 at ¶ 82; ECF No. 102 at ¶ 82.  Thus, Jarvis and Smith did not learn that the allegations against them were serious enough to warrant potential termination until Janney informed them that they had been terminated on February 7, 2011.  In the absence of any prior notice that termination was imminent—or even being considered—Jarvis and Smith were deprived of a "fundamental" due process requirement—the right to "present reasons . . . why [the] *proposed* action should not be taken." *Loudermill*, 470 U.S. at 546 (emphasis added); *Matthews*, 819 F.2d at 892.[3]

---

[3] Defendants have argued that "due process does not require that the District inform Plaintiffs in advance of its intent to terminate."  ECF No. 101 at 9.  This argument is squarely foreclosed by the Ninth Circuit's decision in *Matthews* and misconstrues a fundamental requirement of due process.  *See, e.g.*, *Loudermill*, 470

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 15

To whatever extent Jarvis and Smith received notice on February 4th, that there was a dispute about the fiber group's figures, the court finds that the notice was not specific enough to comport with due process.  Unlike an employee who is confronted by his employer about specific instances of misconduct, Jarvis and Smith were never advised of the precise nature of the "charges" against them.  Rather, they were simply informed that they had failed to fulfill their responsibility to ensure that the information provided by the fiber group was accurate.  Notably, Jarvis and Smith were never advised how their alleged shortcomings as managers might amount to cause for termination.[4]

---

U.S. at 542 ("An essential principle of due process is that a deprivation of life, liberty or property be **preceded by notice** and opportunity for hearing appropriate to the nature of the case.") (emphasis added) (internal quotations and citation omitted).

[4] Defendants did not articulate how Jarvis's and Smith's conduct amounted to cause for termination until pressed by the court during the June 20, 2012 motion hearing.  Only then did Defendants' counsel specifically articulate that the cause for their termination was violation of Policy #101, example 4) ". . . conduct that threatens to or actually does impair or injure the District's reputation, or otherwise threatens to or actually does harm the District;" and example 5) "[f]ailure to devote

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 16

Second, the court finds that the claimed pre-termination hearings on

February 7, 2011, did not afford Jarvis and Smith a meaningful opportunity to be

heard.  As the PUD readily admits, these "hearings" began with Janney reading

from a prepared script informing Jarvis and Smith that they had been terminated.

ECF No. 85 at 179.  The unmistakable tenor of this script is that Janney had

already made his decision to terminate Jarvis and Smith—and that his decision was

final.

Although Janney nominally advised Jarvis and Smith that they "ha[d] the

right to be heard on my reasons," the record reflects that Janney was not open to a

meaningful dialogue.  Indeed, when Smith attempted to further explain the reasons

for the discrepancies in the fiber group's figures, Janney rejected his explanations

out-of-hand, explaining that "this is all a continuation of our discussion on Friday

[February, 4, 2011]."  ECF No. 71 at Exhibit 67.  Accordingly, the February 7,

2011 meetings did not afford Jarvis and Smith a meaningful opportunity to

"present [their] side of the story" before being terminated.  *Loudermill*, 470 U.S. at

546; *see also Matthews* 819 F.2d at 893 (holding that teacher's right to due process

was violated by school board's vote to terminate her employment before holding a

his or her best efforts to the District."  The court finds that the PUD's attempts to

"have it both ways" on this issue prejudiced Jarvis's and Smith's ability to

understand and respond to the PUD's reasons for terminating them.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 17

pre-termination hearing).  *Loudermill* clearly counseled, "[e]ven where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Loudermill*, 470 U.S. at 543.

Defendants argue that the February 7, 2011 meetings satisfied Jarvis's and Smith's right to "pre-termination" due process because the terminations did not become *effective* until two days later.  Because Jarvis and Smith could have contested their terminations during this two-day window, Defendants argue, the essential requirements of due process were satisfied.  This argument is not persuasive.  Defendants have offered no Ninth Circuit authority for the proposition that "an employee's pre-termination hearing does not have to precede the termination decision, but only must precede the termination of benefits, to satisfy due process."  ECF No. 101 at 8 (quotations and citations omitted).  To the extent that the Ninth Circuit draws any distinction between the decision to terminate and the termination of benefits for purposes of procedural due process, that distinction is governed by *Bignall v. North Idaho College*, 538 F.2d 243 (9th Cir. 1976).[5]  In

---

[5] This case was decided nearly a decade prior to the Supreme Court's decision in *Loudermill*.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 18

that case, the Ninth Circuit held that the formal termination of benefits is only

relevant to the pre-termination due process inquiry where the employee is "*still*

*employed at the same job* and while *adequate procedures remain to challenge and*

*forestall the [termination]*." 538 F.2d at 246 (emphasis added). In that case,

Bignall received notice in January that her fall teaching contract would not be

renewed.

      Here, the court finds that Jarvis's and Smith's terminations were, for all

intents and purposes, "effective" on February 7, 2011. As evidenced by Janney's

termination script, Jarvis and Smith were forbidden from accessing their

computers, told to collect their personal belongings (with the assistance of a

security officer) and ordered to leave the premises within two hours of being

informed that they had been terminated. Shortly thereafter, Janney announced the

firings—as well as Javis's and Smith's replacements—to the entire PUD employee

roster. He also announced the firings to the general public in a press release later

that same day. These facts lead to one inescapable conclusion: that Jarvis and

Smith were formally terminated on February 7, 2011. As of that date, Jarvis and

Smith were not in a position to "challenge and forestall" their terminations while

"still employed at the same job." *Bignall*, 538 F.2d at 246. Accordingly, the fact

that Jarvis and Smith were ultimately paid for two additional workdays is

irrelevant to the pre-termination procedural due process analysis.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 19

1    Finally, to the extent that Defendants believe that the February 4, 2011

2    meetings satisfied Jarvis's and Smith's right to be heard, such a belief is entirely

3    misplaced.  As discussed above, Jarvis and Smith had no reason to believe that

4    their jobs were in jeopardy when they met with Janney to discuss the variations in

5    the fiber group's reported figures.  By all accounts, Janney's purpose in conducting

6    these meetings was to convince Jarvis and Smith to acknowledge that the figures

7    reported in August of 2010 could have been either misinterpreted or construed as

8    misleading.  While Janney apparently believed that any such acknowledgement

9    amounted to grounds for termination, Jarvis and Smith believed that they were

10   simply being asked to acknowledge that Janney had presented a valid concern.  At

11   bottom, Jarvis and Smith had no reason to believe that they were being asked to

12   defend themselves against allegations of misconduct during their February 4, 2011

13   meetings with Janney.  Accordingly, these meetings did not satisfy the

14   requirements of pre-termination due process.

15       Plaintiffs are entitled to summary judgment on these claims that they were

16   denied a proper pre-termination due process hearing.

17   **C. Adequacy of Post-Termination Procedures**

18       Plaintiffs contend that they were not only denied pre-termination due

19   process, but also they were denied a timely post-termination due process hearing.

20   ECF No. 62 at 6-11; ECF No. 114 at 12.  Defendants contend that each were told

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 20

by Janney that they "have a right to be heard on my reasons", each was given a copy of Policy 101, and each was offered a post-termination hearing by letter dated August 3, 2011.

It may seem unnecessary to determine whether post-termination procedures were adequate given the court's ruling above. However, inadequate post-termination procedures can be a distinct due process violation and ultimately, "the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures." *Loudermill*, 470 U.S. at 547 n.12. Accordingly, the court is also required to consider this alleged due process violation.

First, it must be observed that in the context of process due a terminated public employee, a full post-deprivation hearing does not substitute for the required pre-termination hearing. *Loudermill* itself reveals that post-termination administrative hearings, even if followed by judicial review, are ordinarily insufficient standing alone to satisfy procedural due process in the public employee context. Although the nature of subsequent proceedings may lessen the amount of process that the state must provide pre-termination, subsequent proceedings cannot serve to eliminate the essential requirement of a pre-termination notice and opportunity to respond. *See Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 332 (9th Cir. 1995). The "absolute" right to adequate procedures stands independent from the ultimate outcome of the hearing. *Id.; see also Knudson v.*

1   *City of Ellensburg*, 832 F.2d 1142, 1148-49 (9th Cir. 1987) (denial of a required

2   pre-termination hearing is always actionable, even where an adequate post-

3   deprivation hearing was provided and even where the deprivation itself was

4   justified).  Where the procedures are constitutionally inadequate, but the property

5   deprivation was justified, a plaintiff could recover nominal damages. Where the

6   deprivation was unjustified, the plaintiff is entitled to full compensatory damages.

7   *Id.*

8          At minimum, one must be given notice and an opportunity to be heard at a

9   meaningful time and in a meaningful manner by an impartial decision maker, have

10  an opportunity to confront all the evidence adduced against him and present his

11  own evidence.  *See generally, Vanelli v. Reynolds School Dist. No. 7*, 667 F.2d 773

12  (9th Cir. 1982).

13         In this case, the court finds that Janney's statement contained in his script

14  that "[y]ou have a right to be heard on my reasons," does not constitute a post-

15  deprivation hearing.  Indeed, it is not a hearing at all, but rather an offer to repeat

16  the reasons for the termination that has already occurred.

17         Second, the court finds that handing each terminated employee a copy of

18  Policy 101 is not an offer of a valid post-termination hearing.  Defendants' have

19  taken two inherently contradictory positions:  First, Defendants contend that Policy

20  101 does not create **any rights other than** changing "at will" employees to

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 22

terminable for cause and that no promises of specific treatment in specific

circumstances is intended.  Second, Defendants contend that a copy of Policy 101

was given to each plaintiff, obviously for the purpose of invoking the double

hearing procedure outlined on page 2 of the policy.  In fact, Defendants' offer in

August 2011 referenced this policy as providing for a post-termination hearing.

ECF No. 85 at 446-451.

The court finds that Policy 101 does not provide, on the undisputed facts of

this case, a valid post-termination hearing process.  The first contemplated hearing

is plainly only applicable "[p]rior to discharge. . . ."  That did not occur in this

case.  The second hearing contemplated by Policy 101 is specifically limited to

"address the reasons for the employee's discharge, but not the decision to

discharge."  With those stated limitations, a valid post-termination hearing was not

offered.

Finally, the Defendants contend that the August 3, 2011 letters sent to each

plaintiff six months after they were terminated and their subsequent declination of

the offered hearing, constituted a waiver of their right to a due process hearing.

The court finds otherwise.  Post-termination hearings must be given at a

meaningful time and in a meaningful manner.  *See e.g., Bignall v. North Idaho*

*College*, 538 F.2d 243 (9th Cir. 1976).  Neither of those prerequisites is present in

an offer six months post-termination.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 23

1    Plaintiffs are entitled to summary judgment on these claims that they were

2  denied a timely and proper post-termination due process hearing.

3  **D. Cause for Termination**

4    The court finds that genuine issues of material fact remain concerning

5  whether Defendants had adequate cause to terminate Jarvis and Smith.  As an

6  initial matter, the parties have offered conflicting and internally inconsistent

7  evidence concerning the precise reason or reasons why Jarvis and Smith were

8  terminated.  The script read by Janney during the February 7, 2011 termination

9  meetings suggests that Plaintiffs were terminated for (1) acknowledging that the

10  figures reported by the fiber group were misleading; (2) demonstrating

11  "carelessness and inattention" during the reporting process; (3) damaging the

12  PUD's reputation; and (4) Janney's lack of confidence in their abilities as

13  managers.  ECF No. 85 at 411.  Janney's subsequent internal and external

14  announcements of the firings state that Janney wanted to be more "philosophically

15  aligned with [his] management team," and that he terminated Jarvis and Smith

16  "[t]o restore full confidence in his management team."  ECF No. 85 at 418, 421.

17  Janney later testified that the "primary focus" of his decision to terminate Jarvis

18  and Smith was the misleading nature of the figures reported by the fiber group and

19  their alleged admission to knowing that the figures were misleading when they

20  were reported.  Janney Dep., ECF No. 73, at 390.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 24

1    Counsel for Defendants contended at oral argument that Jarvis and Smith

2    were terminated specifically only for violation of Policy 101, examples 4 and 5:

3         4.    . . . conduct that threatens to or actually does impair or injure the
          District's reputation, or otherwise threatens to or actually does harm the
4         District.

5         5.    Failure to devote his or her best efforts to the District.

6         Plaintiffs, for their part, have presented facially credible evidence that

7    Janney knew—or should have known—that the reported figures were not as clear-

8    cut as he claimed to believe.  They have also presented evidence from which a

9    rational jury could conclude that Janney terminated their employment in response

10   to pressure from the PUD's Board of Commissioners in an effort to deflect scrutiny

11   away from himself.  Thus, the court finds that the conflicting evidence about the

12   precise reason or reasons why Plaintiffs were terminated precludes summary

13   judgment.

14        Moreover, questions of material fact abound concerning the discrepancies in

15   the fiber group's reported figures.  While there is no question that the differences

16   between the figures were substantial, lingering questions remain about whether the

17   August 2010 and November 2010 estimates presented (or were even intended to

18   present) a true "apples to apples" comparison.  Stated differently, there is

19   conflicting evidence about whether the discrepancies were caused by mistakes on

20   the part of the fiber group or whether those interpreting the figures at the highest

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 25

1  levels of management simply misunderstood what they were intended to convey.

2  The court concludes that this crucial issue of fact must be resolved by a jury.

3  Accordingly, Plaintiffs' motion for summary judgment on the cause for

4  termination issue is denied.

5  **E. Deprivation of Liberty Interest**

6          The termination of a public employee which includes publication of

7  stigmatizing charges triggers due process protections.  A liberty interest is

8  implicated in the employment termination context if the charge impairs a

9  reputation for honesty or morality.  However, Plaintiffs each obtained alternative

10 employment and have agreed to the dismissal of their liberty interest claims.

11 ECF No. 98 at 14.

12 **F. Qualified Immunity**

13         Defendant Janney argues that he is immune from suit under the doctrine of

14 qualified immunity.[6]  "[G]overnment officials performing discretionary functions

15 [are entitled to] a qualified immunity, shielding them from civil damages liability

16 as long as their actions could reasonably have been thought consistent with the

17 rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635,

18

19 [6]  Qualified immunity is not a defense available to the PUD.  *Owen v. City of*

20 *Independence, Mo*., 445 U.S. 622 (1980).

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 26

638 (1987) (citations omitted).  In deciding whether a government official is

entitled to qualified immunity, the court must consider (1) whether the facts,

viewed in the light most favorable to the party alleging the injury, show that the

official's conduct violated a constitutional right; and (2) whether the right was

clearly established at the time of the alleged violation such that a reasonable

official would have understood that his actions violated that right.  *Saucier v. Katz*,

533 U.S. 194, 201-02 (2001).

As discussed above, Janney violated Plaintiffs' right to procedural due

process by failing to provide them with advance notice of their terminations and a

meaningful opportunity to be heard before the terminations became effective.

Accordingly, the dispositive question for purposes of the qualified immunity

analysis is whether the Plaintiffs' rights to (1) *advance* notice of the terminations;

and (2) a *meaningful* opportunity to be heard was clearly established at the time of

the violation.  *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149

F.3d 971, 977 (9th Cir. 1998) (emphasizing that courts "should focus the qualified

immunity inquiry at the level of implementation" rather than the more general

nature of the constitutional right at issue).  The court finds that these rights have

been clearly established since the Supreme Court decided *Loudermill* in 1985:

> An essential principle of due process is that a deprivation of life, liberty, or
> property be preceded by notice and opportunity for hearing appropriate to
> the nature of the case.  We have described "the root requirement" of the Due
> Process Clause as being that an individual be given an opportunity for a

1
2
3

> hearing before he is deprived of any significant property interest. This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. As we pointed out last Term, this rule has been settled for some time now.

4   470 U.S. at 542 (emphasis in original) (internal quotations and citations omitted).

5           In light of *Loudermill* and its progeny, a reasonable official in Janney's

6   position should have known that the procedures followed in this case violated

7   Jarvis's and Smith's right to procedural due process. The very essence of the

8   *Loudermill* decision is that an employee must be given a fair opportunity to oppose

9   his termination before it occurs. This necessarily requires "oral or written notice of

10  the charges against him" and a subsequent opportunity "to present reasons, either

11  in person or in writing, why [the] proposed action should not be taken."

12  *Loudermill*, 470 U.S. at 546. A simple discussion of conduct which the employer

13  subjectively believes amounts to cause for termination—without notice to the

14  employee that disciplinary action is being considered—like that which occurred at

15  the February 4th meeting, does not satisfy this standard. Neither does terminating

16  an employee, locking him out, announcing it to every employee in the organization

17  and the press, and then claiming the employee had two days to discuss the matter

18  before being taken off the payroll. Finally, irrespective of the pre-termination

19  violation, no post-termination due process hearing was provided. Post termination

20

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 28

due process has been required since at least the time *Loudermill* was decided in 1985.

Janney has made some reference to the advice of counsel he received when he took his actions, as well as his consultation with the human resources department. However, his subjective good faith is not the issue. Qualified immunity is the legal question of whether Janney's actions were objectively reasonable in light of prevailing law at the time. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815-19 (1982).

Accordingly, Janney is not entitled to qualified immunity.

**G. Punitive Damages**

Defendant Janney seeks summary judgment on Plaintiffs' allegations that punitive damages are available on this record.[7] For the reasons stated, the court finds that crucial issues of fact and credibility determinations must be resolved by a jury.

**H. Breach of Promise of Specific Treatment**

The PUD has moved for summary judgment on Plaintiffs' state law claims for breach of promise of specific treatment in specific circumstances. According to

---

[7] Punitive damages are not available against the PUD. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 29

the PUD, these state-law claims are based upon the theory that it violated Policy 101 by terminating Plaintiffs' employment without adequate cause.[8]  Assuming that Plaintiffs have accurately identified the basis for these claims,[9] Plaintiffs must demonstrate: (1) the existence of a promise by the PUD; (2) justifiable reliance upon that promise; and (3) breach of the promise.  *DePhillips v. Zolt Const. Co., Inc.*, 136 Wash.2d 26, 37, 959 P.2d 1104, 1110 (1998).

The parties agree that the terms of Plaintiffs' employment with the PUD were governed by a document entitled "Nature of Employment – Non-Bargaining Unit Employees – Policy #101".  This policy provides, in relevant part:

> Purpose
> The policy describes the nature of employment for non-bargaining unit employees.  This policy changes the previous "At Will" employment relationship between the District and its non-bargaining unit employees.
>
> Policy
> . . . Although employees are not bound to continue the employment relationship and may terminate their employment at any time, the District may terminate employment of non-bargaining unit employees immediately only for cause.  "Cause" to terminate employment includes any reason

---

[8]  This employment termination type cause of action only applies against the PUD.

[9]  The parties appear to disagree about the basis for Plaintiffs' state law claims. Given that the PUD is the only party seeking summary judgment on these claims, however, the court will analyze whether Plaintiffs have created a triable issue of fact under the PUD's interpretation of their claims.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 30

determined to be cause under the common law of the State of Washington. A few examples of conduct or circumstances that may constitute cause include:

\* \* \*

4.  Commission of an act involving moral turpitude, dishonesty, theft, or unethical conduct, or conduct that threatens to or actually does impair or injure the District's reputation, or otherwise threatens to or actually does harm the District.

5.  Failure to devote his or her best efforts to the District.

ECF No. 85 at 413-14.

As an initial matter, the court finds that Policy 101 contains an express and unambiguous promise that non-bargaining unit employees will not be terminated except for cause. Accordingly, the first element of Plaintiffs' claims is easily satisfied.

With regard to the second element of Plaintiffs' claims, there is little doubt that Plaintiffs relied upon the PUD's promise that they would not be terminated except for cause. Contrary to Defendants' assertions, the fact that Jarvis and Smith both applied for other jobs while employed by the PUD does not preclude them from establishing reliance. Indeed, the argument that a tenured employee is effectively precluded from seeking career advancement outside his or her current organization is patently absurd. In any event, the record reflects that (1) Jarvis would not have considered abandoning his tenured employment with the PUD unless he was offered similar job security with a different employer (Jarvis Decl.,

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 31

ECF No. 107, at ¶ 6): and (2) Smith did not apply for any positions outside the PUD after his employment was changed from at-will to for cause in 2004 (Smith Decl., ECF No. 108, at ¶ 6). Smith also testified that he purchased a new car in express reliance upon his continued employment. Thus, on the record presently before the court, Jarvis and Smith have established adequate reliance.

Further, the court finds that Policy 101's disclaimer language does not preclude Plaintiffs from establishing reliance. The disclaimer language at issue reads:

> This Policy and other District Administrative Policies are not intended to create a contract of employment. Nor are they intended as promises of specific treatment in specific circumstances and may not be relied upon for those purposes.

ECF No. 85 at 414. Defendants claim that this language effectively precludes Plaintiffs from relying on the District's promise that they would not be terminated except for cause. This argument fails for two reasons. First, Policy 101 was amended in 2004 for the express purpose of changing the employment status of non-bargaining unit employees from terminable at-will to terminable only for cause. For employees like Jarvis and Smith—who had previously been terminable at will—this amendment represented a major concession by their employer. Any reasonable employee in Jarvis's and Smith's position would have understood this concession to be binding upon the PUD unless and until it was expressly revoked.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 32

1    Second, the cases relied upon by Defendants in support of their disclaimer

2    arguments are distinguishable.  Critically, each of these cases involve promises

3    allegedly made by an employer in the context of an at will employment

4    relationship.  *See Swanson v. Liquid Air Corp.*, 118 Wash.2d 512, 515, 826 P.2d

5    664, 665 (1992); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 221, 685

6    P.2d 1081, 1083 (1984); *Birge v. Fred Meyer, Inc.*, 73 Wash. App. 895, 900, 872

7    P.2d 49, 52 (1994); *Nelson v. Southland Corp.*, 78 Wash. App. 25, 28, 894 P.2d

8    1385, 1386 (1995); *Quedado v. Boeing Co.*, --- Wash. App. ---, 276 P.3d 365, 372

9    (2012); *Kinne v. Othello Cmty. Hosp.*, 2010 WL 457361 at *1 (E.D. Wash. 2010)

10   (unpublished).  The fundamental question presented in each of these cases was

11   whether the employer's alleged promise of specific treatment was sufficiently

12   definite to "contractually modify the terminable at will relationship."  *Swanson*,

13   118 Wash.2d at 520.  Where, as here, the promise at issue is that an employee will

14   no longer be terminable at will, there is no need to determine whether the promise

15   "create[s] an implied contract modifying the at-will relationship."  *Quedado*, ---

16   Wash. App. ---, 276 P.3d at 368-69.  In this circumstance, the at-will employment

17   relationship has been expressly modified.  Defendants conceded at oral argument

18   that Plaintiffs were terminable only for cause.

19   Finally, as discussed above, Plaintiffs have established a triable issue of fact

20   regarding whether the PUD had adequate cause to terminate their employment.

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 33

Accordingly, the PUD is not entitled to summary judgment on the third element of Plaintiffs' state law breach of promise claims. The PUD's motion for summary judgment on these claims is denied.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiffs' motion for summary judgment (ECF No. 61) is **GRANTED in part** and **DENIED in part**.

2. Defendants' motions for summary judgment (ECF Nos. 82 and 91) are **DENIED in part and GRANTED in part**.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** this 27th day of June, 2012.

*s/ Thomas O. Rice*

THOMAS O. RICE
United States District Judge

ORDER GRANTING PARTIAL SUMMARY JUDGMENT ~ 34